I'd like to focus on a couple of points with Mr. Leatherbury, if I may. First, we have a case that was relied upon by the defendants and by the trial court, and I think it's the Arige case, I can't remember how it's pronounced, for the proposition that the VA, the Veterans Administration, in a statement that Mr. Leatherbury had a 10% osteoarthritis disability in his knees does not establish that he had a disability. And I think for two reasons, the reliance on that case is misplaced. As I understand the reasoning that the VA letter doesn't automatically mean disability. It doesn't automatically mean disability. So what we're really trying to determine, we're not determining whether he will ever be disabled, but whether he was disabled at the time of the situation, applying FEHA, right? Correct. That's our deal. But I would like to point out that the VA letter, you have to look back at Mr. Leatherbury's qualifications. Mr. Leatherbury had a long career in the military. He's not a Delta Force guy who's hiking 30 miles in the mountains with a 180-pound pack. His expertise in the military, his military occupational specialty, as somebody who's in the military would call it, his MOS was as a warehouse supervisor, a logistics expert, somebody who is in one of the biggest supply chains in the world, a supply chain and equipment and supply distribution organization that makes the C&H factory look like a dollhouse, I would submit. And it was that very expertise that C&H relied upon in hiring him. So when the VA comes in and says he's got a 10% disability, and with that specialty in mind, I think the VA submission should bear some weight. And I believe it did bear weight with Dr. Guest, the company doctor, who ultimately examined him. And remember what the district court actually said in her order granting the motion, that literally the day that he's terminated, and he has no idea that this is going to happen, he's gone to see Dr. Guest. Dr. Guest then immediately calls Ms. Cronin and says, I have concerns, this is the district court, I have concerns that Mr. Leatherberry may not be able to perform his duties on the beltline with his condition. There was a diagnosis. He was called back, he was told to go back to work, true, but there was a diagnosis and the doctor had indicated, I have concerns that he's not going to be able to do this job. They say, well, he didn't tell us at the beginning that he had any osteoarthritis problem, so how can we say now that he's got a disability. Well, go ahead. You're going. You're the boss, you're the chief. My good colleague, I'll sit back. All right. Well, here's my question to you. So let's assume that, in fact, they knew that he had the disability anyway. Does that prevent him from being able to terminate him for other reasons? No. No. But they proffered their reasons, and there are, I think, three of them. There's the fact that he supposedly violated the union contract by clearing the log jam in the beltline. There is the claim that he supposedly leaked the notion that C&H had a plan to hire nonunion workers in the event of a strike. And then there's the third, which now apparently they're backing away from, and properly so in my view, the fact that he supposedly had performance problems. And I'd like to debunk all three of those reasons. First off, as to the log jam in the beltline, remember what everybody concedes is Mr. Leatherbury's job duties. Among those job duties are he is like a safety officer. One of his jobs is to patrol his area of responsibility for safety issues. One of his responsibilities is to give safety briefings to his employees at the beginning of the shift. He's the guy, the first line of defense on safety issues from management. So when he gets up there and says, I find that there is a safety problem with big packages of sugar that can be falling down from a jammed belt 30 feet to the ground where there are employees working, this is a safety problem. If somebody gets beamed with one of those bags of sugar, they can get hurt or worse. There are no union employees around to fix it, so he fixes it. He's challenged. The union doesn't like that. Somebody spots him and says, that's a union job. You're violating the contract. Mr. Sullivan, his immediate supervisor, calls him in, and according to Mr. Leatherbury, he explains it and everything is okay. There's no documentation. There's no counseling memo. There's no written reprimand. There's nothing to indicate that that was a problem for Mr. Leatherbury until after the fact. So I think that's our dispute as to the legitimacy of that particular point. On the issue of hiring, it's not a politically correct term, but hiring scabs. All that said, you would not disagree that that kind of conduct would harm the company's negotiations with the union. I disagree. I disagree because his job was safety first. I understand you're arguing what his job is. I'm not enough to know about C&H and how you deal with those kinds of situations. I've only worked in grain elevators myself. So I don't know exactly what you do in those situations. I'm not sure that was his only response he could have given or he could have turned off things or whatever he could have done. I'm not sure. I'm just suggesting it doesn't seem to me, having been involved in union negotiations myself, one could not argue that that conduct, which was specifically reserved to union employees performed by him, could be a harm to negotiation. Let's back up a bit. There is evidence near the beginning of his employment where he's coming back from lunch and he spots a couple of union employees in the parking lot at C&H depositing alcoholic beverage containers into a company trash can in the parking lot. Those employees are then fired. He gets the blame. The union at that point, according to him, and he says management recognized this and knew it, was out to get him. So are they going to create harassing phone calls, nasty notes in his locker, I mean the whole ball of wax. So the employee-employer relationships at C&H make it, certainly at that time, not a nice place to work. And there was a lot of hostility between management and labor. This instance, the evidence is pretty well undisputed, I think. The union didn't like him and they wanted to get rid of him. So are they going to create an issue to get this manager out? The evidence is, according to Mr. Leatherbury, that it's common for union members to try and get rid of, target and get rid of managers they don't like, and vice versa. So the fact that he didn't work for these people or work with these people doesn't mean anything. The fact that he tried and did what he thought was the right thing for a safety issue, does it jeopardize it? They raised it. Did it legitimately jeopardize the negotiating process? I would submit the inference in our favor is no, because it was raised to get rid of a manager they didn't like. May I change the subject just a little bit? Certainly. Sure. You have that prerogative, Your Honor. At the time of the termination, it seemed to me that the company knows he had said he wasn't sure he could perform the job due to arthritis. Right. But Dr. Guest had said he could. Dr. Guest. That's what he said. I read the testimony. Then, and not only he could but without restriction, did your client ever request a reasonable accommodation? I think he requested that he either be given back. Answer my question. Yes. Did he ever? Yes. What did he do? What was the request? He had been transferred from the dock job, first from warehouse to dock, to Beltline. The dock job and the warehouse job did not impose the same kind of physical demands as the Beltline did, and he asked, send me back to one of those. He had already, though, trained his warehouse replacement. So, you know, according to CNA, that's not an option anymore. The dock job, which he had been told was permanent, a permanent assignment, ended up behind his state of mind. He wasn't told. It was only a two-month job. So that job apparently was not open to him. That's what he asked for back. The second point that I'd say is our question, did he ever ask the company or give the company any statement of work restrictions? Well, he told them. He did not give them a statement in writing. He told them. He sent an email to Sullivan and to Mr. Lee, his two immediate supervisors, indicating that I'm having trouble doing this. I don't know if I can perform because of my condition. I don't know if I can do this job. But even after he sent the letter to Lee and Sullivan, he was gone by the 29th. So it's a little tough to decide. But Dr. Guest never prescribed anything more than pain relievers. Remember, Your Honor, this is all happening in a very compressed timeframe. I know where it's happening. I got my timeline right here. It's a two-week period. So he's a soldier, right? He's trying to tough it out. And if you saw him, you'd understand. He's a big, muscular man. So he's trying to tough it out. But he's telling us, at the end of the day, I can barely walk. That's a huge impact on a major life activity. We all need to be able to walk. Or we're going to suffer a serious devaluation in our lives. So, yes, he did tell them. He told them multiple occasions. He went to the doctor three times. The last time, the Dr. Guest recognized this could be a problem here. There was a diagnosis, not only from the VA, for essentially the same job as a warehouse operator or manager, and Dr. Guest's own analysis as he related to Ms. Cronin. And this notion that, well, Mr. Merritt, Mr. Engel, and Mr. Sullivan all meet with Ms. Cronin, and they go first and say, we're going to fire him. We've decided we're going to fire him. What do you think? Well, hey, he's got this potential problem. Dr. Guest has told me that he might have this medical issue. Oh, well, we don't have to do that. Now, we've already decided. That is the ultimate in hypocrisy and gotcha, that because of the order that we discussed this in a meeting, we've already decided because Ms. Cronin went last? That's ridiculous. So back to this issue of the pretext, the scab issue, the hiring of the non-union employees, that's a phony issue, and I'll tell you why it's a phony issue. Mr. Merritt, whose deposition, again, I took, indicated that he had only told his inner circle of managers about the plan to hire non-union employees if the inner circle did not include Mr. Leatherbury. So if Mr. Leatherbury knew about this plan and related it to the union employees, which he denies, so there's a disputed fact on this, but assumed that he did, well, where did he get his knowledge? It had to have come from one of the inner circle or Mr. Merritt. Well, I've asked Mr. Merritt, and it's in the record. Did you look? Did you ask who leaked from your inner circle? If this is so critical that you're going to fire somebody over it, did you investigate who in your inner circle, your most trusted managers, who leaked it to Mr. Leatherbury? Didn't make any effort. Aren't you basically second-guessing what the employer should do as opposed to whether or not it's a legitimate reason? I think it shows that it is not legitimate because if it was so legitimate that we have to fire Mr. Leatherbury, it should have been legitimate enough to look to see the source of the leak and maybe do something about the manager who leaked it to Mr. Leatherbury to begin with. And the fact that he didn't do that, made no effort to do that, didn't care, tells us that the issue is a phony one. On the issue of job performance, there's disputed issues on that one as well. That's the issue. He's on the job for two weeks. His sole training is the delivery, according to Mr. Leatherbury, of an obsolete set of schematics and a walk-through for one day on the belt line in a very complex, old, creaky plant with lots of belts running all over the place that Mr. Leatherbury is now supposed to supervise. He's got obsolete schematics. A week later, he's quizzed on the obsolete schematic. He gives correct answers according to the obsolete schematic and they tell him, hey, wait a minute, you failed. You're not giving me the right answers. And then what happens, he says, hey, guys, Mr. Sullivan, Mr. Lee, you've given me the wrong stuff to study here, the wrong study materials. Oh, don't worry about it. And then later, when it comes time for termination, he's a poor performer. Never mind that before this, his reviews, with the exception of the same thing as Ray, the initial one, where everybody gets at the beginning of their employment the needs improvement mark, his reviews previously were all satisfactory or above. No question about his performance. Time is gone. Thank you. Thank you, Your Honor. We'll hear from Mr. Gooden again. Thank you, Your Honors. I believe the question that is raised by this appeal, at least with respect to Mr. Leatherbury's disability claim, is whether an employee's subjective opinion of his or her own condition alone is enough to establish a disability and gain protection under federal and state law. The case law is clear that it is not. The Arteaga v. Brinks case that we cite in our papers states unequivocally that an employer has the right to rely on medical information, not an employee's subjective opinion. If an employee's subjective opinion was all that was required to gain protection of federal and state law, discrimination law, I don't know that the courts could handle the crowded docket. So, for that very reason, it's clear that an employer is entitled to rely on medical information. And the only medical information that C&H had was consistent in every way. He was always returned to work and always allowed to work with no restrictions, including the very day that he was terminated. He was given painkillers, but he was cleared to work with no restrictions. Mr. Giannetti did allude to the cases that we cited regarding the VA determinations. The only cases that I was able to find, we cited in our papers, say that a VA disability rating, particularly a low one of 10%, is simply just not particularly irrelevant, not particularly illuminating, certainly not controlling. There is no case law that suggests that that type of a rating is controlling on the issue of a disability as a matter of law. So I believe the district court was correct when it found that Mr. Leatherbury could not even establish a prima facie case because he could not establish that he was disabled. But even if we do make that assumption, even if we assume he was disabled, let's look at the evidence of pretext. There is no dispute here that Mr. Engel, the one that made the decision, this guy needs to be terminated. There is no dispute whatsoever that he had absolutely no knowledge of Mr. Leatherbury's medical condition. In fact, he didn't even know Mr. Leatherbury at all. He had never even met him. Mr. Engel works in New York. He was out at the plant only for collective bargaining negotiations. What about Sullivan? Sullivan, he stated in his declaration that he didn't see Mr. Leatherbury's e-mail until after he was terminated. Regardless of how Mr. Leatherbury may claim, that sounds suspicious, but there is no fact to dispute that. That's his testimony. What about Merritt? Mr. Merritt, there's no evidence or suggestion that he knew anything about Mr. Leatherbury's medical condition. Well, it seems to me that we have Engel, Sullivan, Merritt, and Cronin all in a conversation. Yes. And there's no question what Cronin knew. Correct. But by that point, as Ms. Cronin makes clear in her declaration, when she came into the room, Mr. Merritt and Mr. Engel were already there, and they immediately informed her that they had already made the decision to terminate Mr. Leatherbury. I guess all of that said, counsel makes one great point, I thought. I'm having a tough time seeing why it is obvious that this disability determination was just not at all a part of the conversation when you've got Engel, Sullivan, who already had an email, Merritt, and Cronin, who had had a conversation with the doctor at the time, are in there, and then he's terminated. That doesn't make a question of material fact. Well, I don't believe it does, because there's no dispute that the decision had already been made by Mr. Engel and Mr. Merritt. They both agreed that based on the information that they heard from the union's own negotiator, and this is really the evidence, and there's no dispute about this, as to why these two issues were significant. And it ultimately doesn't matter, as the case law is clear, whether in fact they even happened, or whether Mr. Leatherbury did it. Mr. Taccone, the union's negotiator, reported to Mr. Engel that Mr. Leatherbury performed work reserved for the belt foreman, or to be done at the direction of the belt foreman. That issue was specifically a hot topic in the collective bargaining negotiations at the time, whether they were going to remove those duties and assign them to a non-union supervisor. So that was a hot topic issue. Mr. Leatherbury's report from the union was that Mr. Leatherbury performed this work, Mr. Engel and Mr. Merritt testified that it harmed the negotiations. There's no dispute about that. The second point, that he made a comment about the strikebreakers, there's also no dispute about that as well, that Mr. Engel and Mr. Merritt learned of that from Mr. Taccone, again, the union's negotiator, and again, Mr. Merritt and Mr. Engel are undisputed in their claim that these two things significantly harm the negotiations, and that was the reason for the termination. That was why they made the decision. What I'm really looking at is a question of material fact. I mean, even if I give your clients every benefit of the doubt of what you've just said, it seems to me that we're really down to, was the disability a part of the conversation before anybody was terminated, period? And then, if it was, shouldn't somebody be able to argue that to the jury? Well, I think, as I believe we pointed out in our brief below, that the issue is a difference between a decision and the carrying out of that decision. The decision had already been made by Mr. Merritt and Mr. Engel before Ms. Cronin told them about Mr. Leatherbury's visit to Dr. Guest. The decision had been made. It had not been carried out yet, correct. But Plano's position, apparently, is that once they've made that decision, Mr. Leatherbury is terminated, they later find out he's disabled, their position, apparently, is that they should reverse that decision because of his disability, even though there's no evidence that his disability played any role in the two primary reasons for his termination, which were the strikebreaker comment and performing bargaining unit work. There's no indication that his disability caused him to do either of those things. So there's no reason in logic why they would stop and wait a second, maybe we should look at this decision a little closer because he's gone to the medical office and, by the way, been cleared with no restrictions, but maybe we should stop and look at this because there's no connection between his purported disability and the reasons for his termination. It would be a much different thing if the only reason for his termination were his poor performance and they were marking that he was seeming to have difficulty negotiating the beltway and having difficulty moving around. There's a clear connection there, then, and that would be a situation where you would expect, certainly, the employer to go back and, well, let's pause on this, let's look at this. But when you have a situation where there's no connect whatsoever between the disability and the reasons for termination, there's no reason whatsoever the employer should stop and give a second guess to its decision that had already been made. There's just no reason why it should do that. And I don't believe that the law says that, or requires... In fact, I believe we cited some EEOC regulations that say that accommodations are always prospective in nature. They don't require employers to go back and undo or revise prior discipline because they later learn an employee was disabled. So I believe not only the law, but here the facts and the logic both, I believe, compel a conclusion that CNH was entirely reasonable in not reversing its already made decision to terminate Mr. Leatherbury. There's just no facts to suggest why they should have done that. Any questions? Thank you. Thank you very much, Judge. Appreciate your argument. I think he took far less. We'll just go on, and we'll submit this case. This will be 1217835, Leatherbury v. CNH, Sugar is submitted.
judges: Benitez, Schroeder, Smith